**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

WILLIE E. DENNIS,                                    20 CV 09393 (MKV)

                          Plaintiff,          **AMENDED**
                                                     **COMPLAINT**
v.                                                   <u>**Jury Trial Demanded**</u>
K&L GATES LLP, DAVID TANG, JAMES
SEGERDAHL, JEFFREY MALETTA,
MICHAEL CACCESE, ANNETTE BECKER,
PALLAVI WAHI, JOHN BICKS, and
CHARLES TEA.


                          Defendants.
-----------------------------------------------------------------X


       Plaintiff, WILLIE E. DENNIS ("Plaintiff"), appearing *pro se,* brings this lawsuit

against Defendants K&L GATES LLP ("K&L GATES" or "the Firm"), DAVID TANG

("Tang"), JAMES SEGERDAHL ("Segerdahl"), JEFFREY MALETTA ("Maletta"),

MICHAEL CACCESE ("Caccese"), ANNETTE BECKER ("Becker"), PALLAVI

WAHI ("Wahi"), JOHN BICKS ("Bicks"), and CHARLES TEA ("Tea"), (collectively,

the "Individual Defendants" and, together with K&L GATES, the "Defendants"), and

hereby alleges, upon information and belief, the following:

## **NATURE OF THE ACTION**

1.      Plaintiff was employed by the Firm as an attorney for seventeen (17) years and was improperly terminated, including in retaliation for his simply raising concerns that the Firm was discriminating against Plaintiff on the basis of his race and in retaliation for his merely raising concerns that the Firm was discriminating against its members and employees on the basis of gender and race and allowing its members to sexually harass the Firm's members and employees.

2.      Plaintiff proceeds pursuant to 42 U.S. Code § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, et seq., as amended ("Title VII"), the New York State Human Rights Law, N.Y. Executive Law §§ 290 et seq. ("NYSHRL") and the New York City Human Rights Law, Administrative Code §§ 8-101 et seq. ("NYCHRL").

3.      As set forth below, Plaintiff, an African American attorney, was a member of the Firm in its New York office for 17 years. He was the victim of systemic racism and discriminatory barriers to equal treatment, which were widely known to exist within the global law firm of K&L GATES and which has included the unlawful denial of bonuses, compensation commensurate with fellow White employees, and fairness with respect to the terms and conditions of his employment.

4.      The Firm was under intense scrutiny from legal publications such as Law.com due to allegations of a culture of sexual misconduct (See https://www.law.com/thelegalintelligencer/2018/12/12/at-kl-GATES-women-alleged misconduct-and-left-as-accused-employees-stayed-on/). When Plaintiff attempted to

discuss the issue with the Firm to mitigate the damage and create a better sexual

harassment process internally, the Firm and a small group of leaders (i.e., the Individual

Defendants) subjected Plaintiff to unlawful retaliation, including reducing his

compensation and, ultimately, discharging him from the Firm. The Firm terminated his

employment after Plaintiff repeatedly demanded that his fellow White employees refrain

from discriminating against African American lawyers and from sexually harassing

women lawyers including law student summer interns.

5.      The Firm also created a racially hostile work environment that was severe

and/or pervasive.

6.      Plaintiff repeatedly complained internally to management of the Firm

about all of the allegations above. When Firm employees and associates learned of the

Individual Defendants' conduct, they did not honor their ethical and legal obligations to

bring the discrimination, hostile work environment, and retaliation to an end.

7.      As a result of Plaintiff's race and protected activity of complaints about

discrimination, harassment and retaliation, the Individual Defendants, who were well

aware and knowledgeable of this, subjected Plaintiff to materially adverse employment

actions.

8.      Defendants progressively increased the pressure on Plaintiff, and added to

the harms and losses being suffered by Plaintiff by continuing to diminish the terms and

conditions of his employment (including compensation) compared to his White employee

counterparts, and ultimately terminated him.

3

## JURISDICTION AND VENUE

9.    This action involves federal questions regarding the deprivation of Plaintiff's rights under 42 U.S.C. Section 1981 and Title VII of the Civil Rights Acts of 1964 and 1991, all as amended. This Court has original jurisdiction over Plaintiff's Section 1981 claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4). The Court has original jurisdiction over Plaintiff's Title VII claims pursuant to those two provisions as well as 42 U.S.C. §2000e-5(f)(3). Furthermore, the Court has supplemental jurisdiction over Plaintiff's related claims arising under New York State and New York City laws pursuant to 28 U.S.C. § 1367(a).

10.    Pursuant to 28 U.S.C. § 1391(c) and 42 U.S.C. §2000-5(f)(3), venue is proper in this district because a substantial part of the events or omissions giving rise to this action, including the unlawful discriminatory and unlawful retaliatory practices alleged herein, occurred in this district. Additionally, the relevant employment records were and are maintained, in whole or in part, at the Firm's office located in this district, which office employs over 100 attorneys.

11.    Plaintiff timely filed a formal charge of discrimination against Defendants with the U.S. Equal Employment Opportunity Commission (EEOC) on March 3, 2020. The EEOC issued a notice of right to sue to Plaintiff on or about August 10, 2020. Plaintiff has accordingly timely filed this action, to wit, within 90 days of the date of his receipt thereof.

4

## PARTIES

### PLAINTIFF

12.      Plaintiff is a resident of New York, New York and is an African American attorney licensed to practice in the States of New York, New Jersey, and the District of Columbia.

13.      Plaintiff was employed by the Firm for seventeen (17) years as an employee in its New York Office located at 599 Lexington Avenue, New York, New York 10022. At all relevant times, Plaintiff was employed by, associated with and/or an employee of the Firm and met the definition of an "employee" under all applicable statutes.

### DEFENDANTS

14.      Defendant K&L GATES is a global law firm with over 1,800 lawyers and 45 offices worldwide. Defendant generated over $1 billion in revenues in 2020. The Firm has a principal place of business at 599 Lexington Avenue, New York, New York, 10022. At all relevant times, Defendant K&L GATES has met the definition of an "employer" under all applicable statutes.

15.      Defendant Tang is a resident of Seattle, Washington and at all times relevant herein served, and continues to date to serve, as a member of the Firm's Executive Committee, as well as Managing Partner of the Asia Offices of the Firm. At all relevant times, Defendant Tang directly participated in the discriminatory, retaliatory,

and otherwise unlawful employment decisions and actions taken against Plaintiff, and was a "covered employer" and/or "aider" or "abettor" under all relevant statutes.

16.     Defendant Segerdahl is a resident of Pittsburgh, Pennsylvania and at all times relevant herein served, and continues to date to serve, as the Global Managing Partner of the Firm. At all relevant times, Defendant Segerdahl directly participated in the discriminatory, retaliatory, and otherwise unlawful employment decisions and actions taken against Plaintiff, and was a "covered employer" and/or "aider" or "abettor" under all relevant statutes.

17.     Defendant Maletta is a resident of Washington, D.C. and at all times relevant herein served, and continues to date to serve, as the General Counsel of the Firm. At all relevant times, Defendant Maletta directly participated in the discriminatory, retaliatory, and otherwise unlawful employment decisions and actions taken against Plaintiff, and was a "covered employer" and/or "aider" or "abettor" under all relevant statutes.

18.     Defendant Caccese is a resident of Boston, Massachusetts and at all times relevant herein served, and continues to date to serve, as the Chairman and Practice Area Leader Asset Management and Investment Funds of the Firm. At all relevant times, Defendant Caccese directly participated in the discriminatory, retaliatory, and otherwise unlawful employment decisions and actions taken against Plaintiff, and was a "covered employer" and/or "aider" or "abettor" under all relevant statutes.

6

19.     Defendant Becker is a resident of Seattle, Washington and at all times relevant herein served, and continues to date to serve, as an employee and Practice Area Leader Corporate of the Firm. At all relevant times, Defendant Becker directly participated in the discriminatory, retaliatory, and otherwise unlawful employment decisions and actions taken against Plaintiff and was a "covered employer" and/or "aider" or "abettor" under all relevant statutes.

20.     Defendant Wahi is a resident of Seattle, Washington and at all times relevant herein served, and continues to date to serve, as the Co-Managing Partner of the United States; Managing Partner in the Seattle office; Chair of the Firm-wide Diversity Committee; and Co-Chair of the Firm-wide India practice of the Firm. At all relevant times, Defendant Wahi directly participated in the discriminatory, retaliatory, and otherwise unlawful employment decisions and actions taken against Plaintiff, and was a "covered employer" and/or "aider" or "abettor" under all relevant statutes.

21.     Defendant Bicks is a resident of New York, New York and at all times relevant herein served, and continues to date to serve, as the Managing Partner in the New York Office of the Firm. At all relevant times, Defendant Bicks directly participated in the discriminatory, retaliatory, and otherwise unlawful employment decisions and actions taken against Plaintiff, and was a "covered employer" and/or "aider" or "abettor" under all relevant statutes.

22.     Defendant Tea is a resident of Pittsburgh, Pennsylvania and at all times relevant herein served, and continues to date to serve, as an employee and Deputy

7

General Counsel of the Firm. At all relevant times, Defendant Tea directly participated in the discriminatory, retaliatory, and otherwise unlawful employment decisions and actions taken against Plaintiff, and was a "covered employer" and/or "aider" or "abettor" under all relevant statutes.

**FACTUAL ALLEGATIONS**

**EXAMPLES OF THE SYSTEMIC RACISM THAT PERMEATED THE FIRM TO CREATE A RACIALLY HOSTILE WORK ENVIRONMENT TOWARDS AFRICAN AMERICAN ATTORNEYS INCLUDING THE PLAINTIFF**

23.     At all relevant times, systemic racism permeated the Firm, creating unlawful discriminatory barriers to equal treatment, which resulted in the widespread and constant loss of opportunities for African American lawyers as well as the Plaintiff.

24.     Though the Firm held itself out as a leader of diversity by supporting minority focused legal bar organizations such as the National Bar Association, the Minority Corporate Counsel Association, and Corporate Counsel Women of Color, internally the Firm practiced systemic racism and sexism.

25.     At the Firm, African American attorneys faced minimal career opportunities, limited training and development opportunities, a denial of access to substantive and high profile legal work, and significant roadblocks to employeeship.

26.     In terms of compensation, African American lawyers employed by the Firm as associates were, and continue to be, paid less compensation than their White counterparts.

8

27.     African American employees were, and continue to be, compensated significantly less by the Firm than the compensation paid to White employees due to their race.

28.     The Firm has failed to provide equal opportunity for African American lawyers, especially in terms of salary, bonuses, training, development, access to clients, and billable hours.

29.     The Firm has not been able to retain African American attorneys because of its discriminatory culture. Within a short period of time after arrival at the Firm, highly qualified African American lawyers have departed:

John Doe 1 (African American)

John Doe 2 (African American)

John Doe 3 (African American)

John Doe 4 (African American)

John Doe 5 (African American)

Jane Doe 1 (African American)

Jane Doe 2 (African American)

Jane Doe 3 (African American)

Jane Doe 4 (African American)

Jane Doe 5 (African American)

Jane Doe 6 (African American)

Jane Doe 7 (African American)

9

Jane Doe 8 (African American)

Jane Doe 9 (African American)

Jane Doe 10 (African American)

Jane Doe 11 (African American)

Jane Doe 12 (African American)

Jane Doe 13 (African American)

30.     In response to each and every departure, Plaintiff would complain internally to Firm Management and the Individual Defendants about the departure of African American attorneys. Plaintiff expressed his concern about the unfair treatment experienced by African American lawyers with respect to opportunities for advancement compared to White attorneys.

31.     Though the public explanation offered by the Firm for each departure was "they left for better opportunities," in fact the Firm did not foster an equitable work environment for these African American attorneys.

32.     When Plaintiff continually raised concerns about this high attrition rate of African American attorneys, Firm Management would repeatedly respond to Plaintiff by saying:

    a. "African American lawyers cannot handle Big Law";

    b. "African American lawyers are not ready to work at AMLAW 250 Firms";

    c. "Black lawyers don't have what it takes to succeed at K&L GATES";

    d. "Black lawyers cannot bring big clients to the Firm";

10

*e. "Black lawyers don't fit in";*

*f. "Black lawyers can't cut the mustard and their legal skills are substandard";*

*g. "African American lawyers are not our preference for our clients…We prefer White and Asian lawyers to be staffed on our clients' matters"; and*

*h. "Black employees are not expected to be good lawyers. We need them to make it rain."*

33.     Each year, Plaintiff was subjected to these racist responses and racist sentiments. Plaintiff was also subjected to a hostile work environment and suffered mental pain and anguish.

34.      Since Defendant Caccese became the Chairman of the Firm in 2017, he has systemically "counseled out" African American employees, and ended the tenure of the only African American employee on the Firm's Executive Management Team.

35.     Currently, there are no African Americans on the Firm's Executive Committee.

36.     The only African American employee who served on the Firm's Executive Management Committee was removed from that committee in 2017.

37.     Jane Doe 1, who is African American, graduated from Harvard Law School, speaks six languages, is the daughter of a civil rights leader and icon, and was the Firm's Chief Diversity Officer. Defendant Caccese forced Jane Doe 1 out of the Firm in 2019, without any explanation.

38.     John Doe 1 was the first and only African American employee in the Firm's largest office, Seattle. He was forced out of the Firm in 2005. There has not been another African American employee in the Seattle office since 2005.

39.     With respect to compensation, the Firm has different standards for Black and White attorneys. The Firm hired White lateral employees, like Defendant Bicks, who never met any of the financial representations he made to the Firm prior to joining. Yet, the Firm still promoted these employees into senior management positions and provided them with compensation significantly above that of African American employees. African American employees who met their commitments and brought in new business were not fully compensated or promoted to senior management positions.

40.     As a result of discriminatory hiring practices as well as discriminatory promotion practices, in 2020, the Seattle, Pittsburgh, and Boston offices – three of the largest offices of the Firm – did not have a single African American male employee. The Boston and Pittsburgh offices do not have a single African American employee. The Firm hides this by listing some African American employees, such as John Doe 7, who resides in New Jersey, in two different offices (New York and Pittsburgh).

41.     As a result of discriminatory hiring practices as well as discriminatory promotion practices, the Boston office, where the Chairman of the Firm is based and controls the hiring and staffing, has never had an African American male employee.

12

Upon information and belief, the Chairman of the Firm is attempting to make the rest of the Firm look like the Boston office.

42.     As a result of discriminatory hiring practices as well as discriminatory promotion practices, the Firm has only one African American employee in the State of California. The Firm has offices in Los Angeles, San Francisco, Palo Alto and Orange County. It is expected that the only African American employee of the Firm in California will retire in 2021.

**PLAINTIFF'S INVOLVEMENT IN THE AFRICAN AMERICAN COMMUNITY AND AWARDS**

43.     Plaintiff, who is an African American, is a graduate of Columbia Law School, Columbia College, and Choate Rosemary Hall.

44.     Plaintiff is licensed to practice law in New York, New Jersey, and the District of Columbia.

45.     Plaintiff has practiced corporate law for over 30 years in New York City working at AMLAW 250 law firms and representing Fortune 500 companies including Microsoft, Goldman Sachs, DuPont, MetLife, CBRE, American Express, Tyco, Toys-RUs, and Darden Restaurants.

46.     Shaped by his background and experience, Plaintiff has always supported gender and racial diversity including:

Supporting national organizations with diversity and inclusion missions for minority lawyers including the Minority Corporate Counsel Association, the National Bar Association, and Corporate Counsel Women of Color.

Serving on the Board of Directors of the Upper Manhattan Empowerment Zone for eight years, working closely with the Honorable Charles Rangel—a former, extraordinarily long-serving Congressman, civil rights leader, and the "dean" of New York's Congressional delegation for many years.

Sitting on the Board of Directors for Junior Achievement of New York.

Counseling numerous political figures and participating in the presidential campaigns of former President Barack Obama in 2008 and 2012, former United States Secretary of State Hillary Clinton in 2016, and President elect Joe Biden in 2020.

47.     Plaintiff has received numerous awards related to his legal and philanthropic efforts. He was named by Black Enterprise magazine as one of the nation's best lawyers and by Savoy magazine as one of the top African American lawyers in America.

14

## PLAINTIFF'S EMPLOYMENT AT K&L GATES LLP

48.      Plaintiff worked at prestigious AMLAW 250 law firms including Akin Gump Strauss Hauer & Feld LLP and Thelen Reid and Priest. Plaintiff had a multimillion-dollar book of business, which was developed over the years through Plaintiff's hard work, board of directors and community work, and relationships in the minority community and with diversity bar associations.

49.      Plaintiff was recruited by the Firm and joined the Firm in 2005, joining its corporate group as an employee.

50.      **When Plaintiff joined the Firm's New York Office in 2005, the Firm had a policy which outlined the terms for compensation and remuneration around origination credit for clients Plaintiff and others brought to the Firm. Per the policy, the employee who establishes the initial client relationship determines the allocations of credit and compensation for the following categories:**

> ***Origination Credit*: Principal client contact. Notably, compensation is higher for origination credit.**

> ***Responsible Matter Credit*: Attorney performing the work for the client.**

> ***Billing and Inventory Credit*: Attorney responsible for billing and collecting fees for the client.**

15

51.     With respect to many clients, Plaintiff, due to his race, was denied the opportunity to participate in the allocation process or was instructed by the Firm as to what the allocation would be without explanation or opportunity for input or appeal.

52.     The Firm recruited Plaintiff, in part, because of the decades of goodwill Plaintiff had built in the African American community, which the Firm believed would provide it the opportunity to obtain new clients.

53.     Also, the Firm was aware of Plaintiff's long-standing advocacy for both fairness in gender and racial diversity. The Firm believed this would enhance the Firm's brand and market position.

54.     Plaintiff nevertheless was subjected to mistreatment for promoting diversity and fairness at the Firm.

55.     The Firm recruited Plaintiff to gain access to his business contacts, clients, and associations, with no intention of keeping the gender and diversity commitments made to Plaintiff.

56.     The Firm used Plaintiff's client contacts and market penetration arising from his support for gender, orientation, and racial diversity, to divert fees Plaintiff brought to the Firm to solely benefit White employees.

16

57.     Plaintiff complained internally about the failure of the Firm to use fees and work generated by Plaintiff to promote diversity and gender equality within the Firm. Plaintiff also complained about discrimination, harassment, and retaliation.

58.     Plaintiff's concerns intensified over a period of three years beginning in 2017, during which Plaintiff expressed to the Defendants – including the Firm's Chair, Executive Committee, Diversity Committee, Chief Diversity Officer, and numerous individual employees – concerns about the Firm's indifference and, in some cases, hostility toward African American attorneys.

59.     Specifically, Plaintiff expressed that the Firm was discriminating against him in his compensation, denial of fair compensation, and access to office services and support staff. Also, Plaintiff was aware that some of the White employees with the same tenure and experience, but lesser client revenues, were paid more than Plaintiff.

60.     In addition, Plaintiff complained to Firm Management and the Individual Defendants that the Firm was failing to adhere to its own equal employment opportunity policy, as well as federal, state, and local prohibitions against racial discrimination.

61.     Plaintiff further complained to the Firm that its African American revolving door and poor diversity record were hurting the Firm's brand, and hampering its ability to create and maintain quality client relationships.

62.     Plaintiff experienced retaliation after bringing these discriminatory

practices to the attention of the Firm's management.

63.     To combat the Firm's racism and poor diversity record, Plaintiff took the

initiative to spearhead many diversity efforts to foster change and, while his advocacy

was well received externally and supported by groups that are typically marginalized in

the legal profession and workplace setting, as well as some of the Firm's most elite

clients, it was ill-received by the Firm.

64.     The Firm continuously discriminated and retaliated against Plaintiff by

interfering with his client relationships and also by failing to compensate him in his base

pay and bonus pay **per the agreed upon terms of the Firm's compensation policy.**

65.     On May 13, 2019, Plaintiff was wrongfully terminated because of his race

and in retaliation for his protected activity (i.e., (i) internal complaints about the

discrimination, harassment, and retaliation Plaintiff was personally subjected to; (ii)

internal complaints about the Firm's discrimination against other African American

lawyers; and (iii) internal complaints about the mistreatment of women at the Firm,

including those who had been, or were being, sexually harassed by senior management.

66.     Even though Plaintiff is no longer at the Firm, the clients he brought to the

Firm remain clients of the Firm. Hence, the Firm's White attorneys continue to be

unjustly enriched by clients that Plaintiff brought into the Firm, clients who continue to generate multi-million dollar revenue for the Firm annually.

### a. PLAINTIFF IS DENIED FAIR COMPENSATION

67.    One of Plaintiff's main clients while at the Firm was Microsoft.

68.    Although Plaintiff expanded the Firm's relationship with Microsoft, an iconic global company and brand, on the strength of his close personal relationships with Microsoft's President and Chief Legal Officer, and a senior Microsoft lawyer who is African American, Plaintiff was cheated out of, and denied fair compensation during his employment at the Firm.

69.    With respect to Plaintiff, the Firm breached its policy of crediting firm employees for introducing new clients and matters to the Firm. For example, even though Microsoft was Plaintiff's client based in part on Plaintiff's relationship with the President and Chief Legal Officer of Microsoft, he was never fairly compensated for the business revenues generated from Microsoft's legal work. He was also denied fair compensation for bringing PepsiCo and Starbucks into the Firm as clients.

70.    Plaintiff, who was at all times qualified, at all times performed and met all of his professional obligations to the Firm.

71.    The Firm repeatedly breached its policy by not fairly compensating Plaintiff.

19

72.     The practice of denying Plaintiff fair compensation continued over Plaintiff's entire seventeen (17) year tenure at the Firm, with compensation diverted to White employees without notice or explanation. Such conduct by the Firm drastically reduced Plaintiff's compensation, and effectively reduced him from being an equity employee to being a junior associate, causing Plaintiff substantial lost wages and other harm.

73.     All of the Firm's actions have caused Plaintiff mental anguish.

74.     The practice of denying African American employees fair compensation at the Firm was institutionalized.

75.     White employees who were Plaintiff's counterparts, such as Defendant Bicks, for example, were allocated compensation which they had not earned.

*b. **P**LAINTIFF AND **A**FRICAN **A**MERICAN **A**TTORNEYS **A**RE **D**ISCRIMINATED **A**GAINST IN **M**ICROSOFT **M**ATTERS*

76.     In addition, the Firm discriminated against Plaintiff and other African American employees and associate attorneys by interfering with and preventing Plaintiff and those attorneys from working on Microsoft matters. This practice by the Firm intentionally kept the compensation of African American attorneys lower than White attorneys at the Firm. As a result, many African American attorneys left the firm nominally "voluntarily," including in lieu of the Firm discharging them.

77.    Among the African American lawyers at the Firm who were excluded and denied opportunities were:

Jane Doe 1 (African American)

Jane Doe 2 (African American)

Jane Doe 3 (African American)

Jane Doe 14 (African American)

John Doe 6 (African American)

John Doe 7 (African American)

78.    When Plaintiff questioned the Firm and the Individual Defendants as to why they were preventing him, and other African American attorneys, from servicing Microsoft, Plaintiff was told by Firm Management that even though Microsoft requested the participation of African American attorneys on its matters, **"Black lawyers don't fit in, and Asian lawyers are preferred."**

79.    Plaintiff found this response, and other, similar responses to be unacceptable, blatantly racist, and in violation of federal, state and local law.

80.    All of Plaintiff's internal complaints of racism and discrimination went ignored and uncorrected.

a. This racism against African American lawyers is one of the reasons why Jane

Doe 1, former Head of Diversity, left the Firm less than 60 days after Plaintiff

was pushed out.

b. This racism against African American lawyers is one of the reasons why Jane

Doe 2 (Employee) left the Firm in 2020

c. Racism against African American lawyers is one of the reasons Jane Doe 3

(Employee) left the Firm at the end of 2019.

81.     Defendants took yet further action against Plaintiff in reprisal for his

complaints, including, but not limited to, barring Plaintiff's access to work on Microsoft

matters and failing to include him in client strategy phone calls, meetings, staffing reports

and strategy sessions.

82.     When Plaintiff requested Defendants Caccese, Segerdahl and Zanic – all

of whom are White – meet with the African American Microsoft lead relationship

attorney, who is based on the East Coast (New York and Washington, D.C.), all three

refused, and said that the African American Microsoft relationship attorney should fly

across country to Seattle to meet with Defendant Becker.

83.     Defendant Becker, another White employee at the Firm, became

Defendants' point person on all Microsoft matters.

84.     Defendant Becker repeatedly told Plaintiff, **"White associates understand the Microsoft contracts better than the Black attorneys."**

85.      The Firm barred African American attorneys and Plaintiff from meeting with the African American Microsoft lead relationship attorney.

86.     Plaintiff was incensed that the Individual Defendants refused to meet with the in-house lead, who is African American. Plaintiff raised concerns that they were treating the African American lead attorney differently than White in-house leads at other clients.

87.     When Plaintiff pressed the matter, and voiced more concerns about the Firm losing the Microsoft business, the Firm's leadership team threatened Plaintiff with reduced compensation if he did not cease such conversations. These threats yet further aggravated the already hostile work environment to which Plaintiff was being subjected, and caused Plaintiff yet further mental anguish.

88.     Shortly thereafter, Defendant Bicks assaulted Plaintiff in the hallway of the Firm's New York office, near the elevator. Defendant Bicks pushed Plaintiff, yelled at him, and spit in his face. This conduct was threatening, offensive, intimidating, and abusive.

89.     The Firm thereafter further punished Plaintiff by reducing his compensation.

*c. PLAINTIFF IS REMOVED AS POINT PERSON FOR CORPORATE COUNSEL WOMEN OF COLOR AND BUSINESS GENERATION IS GIVEN TO NON-AFRICAN AMERICAN EMPLOYEE WHO DIVERTED CONTACTS TO WHITE EMPLOYEES*

90.     Another overt act of discrimination by Defendants related to the relationship with a diversity-focused bar association, Corporate Counsel Women of Color ("CCWC"), which Plaintiff had brought to the Firm.

91.     Through Plaintiff, the Firm's brand had been significantly enhanced as the elite title sponsor of CCWC's annual conference for 14 years. For over a decade, the Firm's affiliation with CCWC, and the exposure the Firm gained at CCWC's annual conference, brought the Firm multiple millions of dollars in revenue by connecting the Firm with prominent in-house decision-making lawyers who awarded business to law firms that valued and championed diversity.

92.     The Firm nevertheless interfered with Plaintiff's relationship with CCWC by barring Plaintiff from participating internally in the strategic development of the relationships that Plaintiff had created and had brought to the Firm.

93.     Each year, Plaintiff requested to be included, and each year he was denied.

94.     The Firm removed Plaintiff as CCWC's point person, and denied him this opportunity because of his race, and thereby also hindered his ability to develop new Clients throughout the year and at the annual conference with Fortune 1000 and Forbes 2000 legal departments.

24

95.     Instead, Plaintiff was replaced by Defendant Wahi, a South Asian employee, as the point person for the CCWC conference. When Plaintiff complained to Defendant Wahi, she responded, **"Black lawyer diversity is not what the Firm is interested in. The Firm is interested in Asian diversity."**

96.     Defendant Wahi became the diversity "face" of the Firm at the CCWC annual event. Defendant Wahi would collect all the contacts at the conference for business generation and then funnel those contacts back to White employees of the Firm.

97.     Defendant Wahi and others made multiple millions of dollars for the Firm, and for themselves, from this practice, while Plaintiff was completely shut out and undercompensated.

98.     For successfully directing business contacts from CCWC to White employees, the Firm rewarded Defendant Wahi, promoting her to Co-Managing Employee of its US Offices and appointing her to the Firm's Executive Management Committee.

99.     Defendant Wahi's appointment to the Executive Management Committee was at the expense of the only African American on the Executive Management Committee, John Doe 6. John Doe 6 was removed from the Executive Management Committee because of his race, even though he was the only African American employee on the Executive Management Committee.

25

100.     Since the Firm replaced John Doe 6 with Defendant Wahi, there have been

no African Americans appointed to the Executive Management Committee.

**d. P**LAINTIFF **I**S DISCHARGED

**A**FTER **P**LAINTIFF **E**NGAGED IN **P**ROTECTED **A**CTIVITY OF **A**DVOCATING FOR **A**FRICAN

**A**MERICAN **L**AWYERS AND **W**OMEN **A**TTORNEYS **W**HO **H**AD **B**EEN **S**EXUALLY **H**ARASSED BY

**M**ANAGEMENT

101.     Some of the Firm's discriminatory practices were publicly exposed in

2018, when the plight of several women who were sexually harassed by partners with

power at the Firm was raised in the national internet publication Law.com on December

12, 2018. See At K&L Gates, Women Alleged Misco*nduct Left, as Accused Partners*

*Stayed On* (Law.com, December 12, 2018)

(https://www.law.com/thelegalintelligencer/2018/12/12/at-kl-GATES-women alleged-

misconduct-and-left-as-accused-partners-stayed-on/). This article brought the Firm

negative attention.

102.     It was known Firm-wide that some of the male partners on the Firm's

Executive Management Committee would "date" women lawyers in the Firm, and then

make determinations about their compensation.

103.     In response to the December 12, 2018 article, on December 20, 2018,

Plaintiff sent over 300 partners in the Firm, including Firm Management, the Head of

Diversity, each of the members of the Firm's Management Committee, and several others

an email addressing the issue.

26

104.     Plaintiff suggested new policies and procedures for preventing similar behavior in the future. As a result of this e-mail, the Firm's Executive Management Committee began more aggressive retaliatory actions against Plaintiff.

105.     On January 30, 2019, Plaintiff was notified that the Firm was barring his access to its offices, and suspending his access to his emails and to secretarial services.

106.     Defendants also engaged in efforts and pressure to force Plaintiff's "overall separation from the Firm."

107.     The reason the Firm gave Plaintiff for his discharge (to wit, that he was involved in a divorce proceeding), was pretextual.

108.     This cited reason by the Firm and inconsistent application to White partners who have engaged in egregious conduct merely highlights the discriminatory nature of the Firm's actions.

109.     No White partners who had gone through divorce proceedings had, or since have, been discharged. To the contrary, even White partners who have engaged in serious misconduct (e.g., spousal abuse; drunk driving; substance abuse; etc.) have not been discharged, or even disciplined by the Firm.

110.     Upon information and belief, Plaintiff, an African American, was the first employee in the history of the Firm to be unfairly discharged.

111.    The Firm never provided Plaintiff an opportunity to present a defense to his discharge, or any other process or opportunity to be heard.

112.    The Firm refused to advise how its vote to discharge him – if, indeed, there actually ever was one – was conducted and, if there was one, who had voted to discharge him.

113.    Plaintiff engaged in protected activity. Defendants were aware of the protected activity. As a result of race discrimination and retaliation, shortly thereafter, on May 19, 2019, the Firm took a materially adverse employment action against Plaintiff in discharging him from the Firm.

114.    Plaintiff was officially terminated on May 19, 2019.

**THE FIRM WEAPONIZES RACE AND HARASSES PLAINTIFF WITH PRIVATE INVESTIGATORS AND ON AND OFF DUTY POLICE OFFICERS AFTER HIS TERMINATION**

115.    Defendants' retaliation and harassment of Plaintiff did not cease upon Plaintiff's termination.

116.    The Firm has since embarked on a campaign of intimidating Plaintiff, which campaign continues through and including the date hereof.

117.    After improperly and unlawfully discharging Plaintiff, Defendants engaged third-party, armed individuals to follow Plaintiff to yet further intimidate and

bully him, including at a conference of Black attorneys in Chicago in September 2019 at the Chicago Marriott Downtown Magnificent Mile.

118.    On Defendants' orders, private investigators and on- and off-duty police officers have also harassed Plaintiff, and his family.

119.    Said individuals have frequently appeared at Plaintiff's home, brandishing their weapons, and otherwise causing Plaintiff and his family significant and severe mental anguish and emotional distress.

120.    The Firm's unlawful conduct and intimidation tactics are ongoing.

121.    To protect himself and his family, Plaintiff has filed complaints against the Firm with the New York County District Attorney's Office, the New York City Police Department, and the Chicago Marriott Downtown Magnificent Mile.

122.    Following the filing of the initial complaint, Defendants' tactics of threats and intimidation increased after the Plaintiff informed Defendant Caccese that the relationships the Firm maintains with certain members of the Chinese Communist Party has resulted in the breach of K L Gates' security walls in the Firm's Beijing, Shanghai, Seoul, Taipei, Hong Kong and Seattle offices.

## FIRST CAUSE OF ACTION
### (Race Discrimination in Violation of Section 1981)
### (Against All Defendants)

123.    Plaintiff realleges and incorporates by reference the foregoing paragraphs.

124.    By the actions described above, among others, Defendants have discriminated against Plaintiff on the basis of his race in violation of Section 1981. Defendants have treated Plaintiff less favorably than White employees by denying him the same terms and conditions of employment available to employees who are White, including, but not limited to, subjecting him to a hostile work environment, and disparate working conditions, and denying him the terms and conditions of employment equal to those of the employees who are White.

125.    As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff suffered and will continue to suffer monetary and/or economic harm, including, but not limited to, loss of future income, compensation, and benefits for which he is entitled to an award of damages.

126.    As a direct and proximate cause of Defendants' discriminatory conduct, Plaintiff also suffered extreme mental anguish, depression, severe disruption of his personal and emotional life, and loss of enjoyment in the ordinary pleasures of everyday life.

127.    As a result of Defendants' violation of Section 1981, Plaintiff has been damaged in an amount to be determined at trial but not less than Five Million Dollars ($5,000,000) for compensatory damages, emotional distress, adverse effects on his career, and diminished earning capacity.

128.    Moreover, Defendants' unlawful and discriminatory actions were

intentional, and done with malice and/or showed a deliberate, willful, wanton, and

reckless indifference to Plaintiff and his rights under Section 1981 for which Plaintiff is

entitled to an award of punitive damages in the amount of Five Million Dollars

($5,000,000) to punish and deter continuation of Defendants' unlawful employment

practices.

129.    Plaintiff is further entitled to pre-judgment interest on all monies awarded,

as well as reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Section 1981)
### (Against All Defendants)

130.    Plaintiff realleges and incorporates by reference the foregoing paragraphs.

131.    By the actions described above, among others, Defendants retaliated

against Plaintiff for making protected complaints regarding discrimination, including by

denying him compensation and discharging him.

132.    As a direct and proximate result of Defendants' retaliatory conduct in

violation of Section 1981, Plaintiff has suffered, and will continue to suffer, harm and

pecuniary losses for which he is entitled to an award of compensatory damages.

133.    As a direct and proximate cause of Defendants' retaliatory conduct,

Plaintiff also suffered extreme mental anguish, depression, severe disruption of his

personal and emotional life, and loss of enjoyment in the ordinary pleasures of everyday life.

134.    As a result of Defendants' violation of Section 1981, Plaintiff has been damaged in an amount to be determined at trial but not less than Five Million Dollars ($5,000,000) for compensatory damages, emotional distress, adverse effects on his career, and diminished earning capacity.

135.    Moreover, Defendants' unlawful and discriminatory actions were intentional, and done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff and his rights under Section 1981 for which Plaintiff is entitled to an award of punitive damages in the amount of Five Million Dollars ($5,000,000) to punish and deter continuation of Defendants' unlawful employment practices.

136.    Plaintiff is further entitled to pre-judgment interest on all monies awarded, as well as reasonable attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
**(Race Discrimination in Violation of Title VII)**
**(Against K&L Gates)**

137.    Plaintiff realleges and incorporates by reference the foregoing paragraphs.

138.    By the actions described above, among others, Defendant K&L GATES has discriminated against Plaintiff on the basis of his race in violation of Title VII.

139.    Defendant K&L GATES has treated Plaintiff less favorably than White employees by denying him the same terms and conditions of employment available to employees who are White, including, but not limited to, subjecting him to a hostile work environment, and disparate working conditions and denying him the terms and conditions of employment equal to that of the employees who are White.

140.    As a direct and proximate result of Defendant K&L GATES's discriminatory conduct, Plaintiff suffered and will continue to suffer monetary and/or economic harm, including, but not limited to, loss of future income, compensation, and benefits for which he is entitled to an award of damages.

141.    As a direct and proximate cause of Defendant K&L GATES's discriminatory conduct, Plaintiff also suffered extreme mental anguish, depression, severe disruption of his personal and emotional life, and loss of enjoyment in the ordinary pleasures of everyday life.

142.    As a result of Defendant K&L GATES's violation of Title VII, Plaintiff has been damaged in an amount to be determined at trial but not less than Five Million Dollars ($5,000,000) for compensatory damages, emotional distress, adverse effects on his career, and diminished earning capacity.

143.    Moreover, Defendant K&L GATES's unlawful and discriminatory actions were intentional, and done with malice and/or showed a deliberate, willful, wanton, and

reckless indifference to Plaintiff and his rights under Title VII for which Plaintiff is entitled to an award of punitive damages in the amount of Five Million Dollars ($5,000,000) to punish and deter continuation of Defendant K&L GATES's unlawful employment practices.

144.    Plaintiff is further entitled to pre-judgment interest on all monies awarded, as well as reasonable attorneys' fees and costs.

### FOURTH CAUSE OF ACTION
**(Retaliation in Violation of Title VII)**
**(Against K&L Gates)**

145.    Plaintiff realleges and incorporates by reference the foregoing paragraphs.

146.    By the actions described above, among others, Defendant K&L GATES retaliated against Plaintiff for making protected complaints regarding discrimination, including by denying him compensation and discharging him.

147.    As a direct and proximate result of Defendant K&L GATES's retaliatory conduct in violation of Title VII, Plaintiff has suffered, and will continue to suffer, harm and pecuniary losses for which he is entitled to an award of compensatory damages.

148.    As a direct and proximate cause of Defendant K&L GATES's retaliatory conduct, Plaintiff also suffered extreme mental anguish, depression, severe disruption of his personal and emotional life, and loss of enjoyment in the ordinary pleasures of everyday life.

149.     As a result of Defendant K&L GATES's violation of Title VII, Plaintiff has been damaged in an amount to be determined at trial but not less than Five Million Dollars ($5,000,000) for compensatory damages, emotional distress, adverse effects on his career, and diminished earning capacity.

150.     Moreover, Defendant K&L GATES's unlawful and discriminatory actions were intentional, and done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff and his rights under Title VII for which Plaintiff is entitled to an award of punitive damages in the amount of Five Million Dollars ($5,000,000) to punish and deter continuation of Defendant K&L GATES's unlawful employment practices.

151.     Plaintiff is further entitled to pre-judgment interest on all monies awarded, as well as reasonable attorneys' fees and costs.

## FIFTH CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL)
### (Against K&L Gates)

152.     Plaintiff realleges and incorporates by reference the foregoing paragraphs.

153.     Defendant K&L GATES has discriminated against Plaintiff on the basis of his race in violation of the NYSHRL by denying him the same terms and conditions of employment available to employees who are White, including, but not limited to,

subjecting him to disparate working conditions and compensation, and ultimately

terminating Plaintiff's employment.

154.    As a direct and proximate result of Defendant K&L GATES's unlawful

and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and will

continue to suffer monetary and/or economic harm for which he is entitled to an award of

damages.

155.    As a direct and proximate cause of Defendant K&L GATES's

discriminatory conduct, Plaintiff also suffered extreme mental anguish, depression,

severe disruption of his personal and emotional life, and loss of enjoyment in the ordinary

pleasures of everyday life.

156.    As a result of Defendant K&L GATES's violation of the NYSHRL,

Plaintiff has been damaged in an amount to be determined at trial but not less than Five

Million Dollars ($5,000,000) for compensatory damages, emotional distress, adverse

effects on his career, and diminished earning capacity.

157.    Moreover, Defendant K&L GATES's unlawful and discriminatory actions

were intentional, and done with malice and/or showed a deliberate, willful, wanton, and

reckless indifference to Plaintiff and his rights under the NYSHRL for which Plaintiff is

entitled to an award of punitive damages in the amount of Five Million Dollars

($5,000,000) to punish and deter continuation of Defendant K&L GATES's unlawful

employment practices.

158.    Plaintiff is further entitled to pre-judgment interest on all monies awarded,

as well as reasonable attorneys' fees and costs.

**SIXTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYSHRL)**
**(Against K&L Gates)**

159.    Plaintiff realleges and incorporates by reference the foregoing paragraphs.

160.    By the actions described above, among others, Defendant K&L GATES

has retaliated against Plaintiff on the basis of his protected activities in violation of

NYSHRL by, inter alia, ignoring his protected complaints about the discriminatory

treatment of non-White employees, subjecting him to increased scrutiny and harassment

and ultimately terminating his employment.

161.    As a direct and proximate result of Defendant K&L GATES's unlawful

and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and will

continue to suffer monetary and/or economic harm for which he is entitled to an award of

damages.

162.    As a direct and proximate cause of Defendant K&L GATES's retaliatory

conduct, Plaintiff also suffered extreme mental anguish, depression, severe disruption of

37

his personal and emotional life, and loss of enjoyment in the ordinary pleasures of everyday life.

163.　As a result of Defendant K&L GATES's violation of the NYSHRL, Plaintiff has been damaged in an amount to be determined at trial but not less than Five Million Dollars ($5,000,000) for compensatory damages, emotional distress, adverse effects on his career, and diminished earning capacity.

164.　Moreover, Defendant K&L GATES's unlawful and retaliatory actions were intentional, and done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff and his rights under the NYSHRL for which Plaintiff is entitled to an award of punitive damages in the amount of Five Million Dollars ($5,000,000) to punish and deter continuation of Defendant K&L GATES's unlawful employment practices.

165.　Plaintiff is further entitled to pre-judgment interest on all monies awarded, as well as reasonable attorneys' fees and costs.

**SEVENTH CAUSE OF ACTION**
**(Aiding and Abetting Discrimination and Retaliation in Violation of the NYSHRL)**
**(Against the Individual Defendants)**

166.　Plaintiff realleges and incorporates by reference the foregoing paragraphs.

167.    The NYSHRL provides that it shall be an unlawful discriminatory practice "[f] or any person to aid, abet, incite, compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

168.    By the actions described above, among others, the Individual Defendants engaged in an unlawful discriminatory and retaliatory practice in violation of NYSHRL by aiding, abetting, inciting, compelling, and coercing the unlawful discrimination by Defendant K&L GATES in violation of the NYSHRL.

169.    By the actions described above, among others, the Individual Defendants engaged in an unlawful and retaliatory practice in violation of NYSHRL by aiding, abetting, inciting, compelling, and coercing the unlawful retaliation in violation of the NYSHRL.

170.    As a direct and proximate result of the Individual Defendants' unlawful discriminatory and retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered and will continue to suffer monetary and/or economic harm for which he is entitled to an award of damages.

171.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff also suffered extreme mental anguish, depression, severe disruption of his personal and emotional life, and of enjoyment in the ordinary pleasures of everyday life.

172.     As a result of Defendants' violation of the NYSHRL, Plaintiff has been

damaged in an amount to be determined at trial but not less than Five Million Dollars

($5,000,000) for compensatory damages, emotional distress, adverse effects on his

career, and diminished earning capacity.

173.     Moreover, Defendants' unlawful actions were intentional, and done with

malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff

and his rights under the NYSHRL for which Plaintiff is entitled to an award of punitive

damages in the amount of Five Million Dollars ($5,000,000) to punish and deter

continuation of Defendants' unlawful employment practices.

174.     Plaintiff is further entitled to pre-judgment interest on all monies awarded,

as well as reasonable attorneys' fees and costs.

## EIGHTH CAUSE OF ACTION
### (Discrimination in Violation of the NYCHRL)
### (Against K&L Gates)

175.     Plaintiff realleges and incorporates by reference the foregoing paragraphs.

176.     Defendant K&L GATES has discriminated against Plaintiff on the basis of

his race in violation of the NYCHRL by denying him the same terms and conditions of

employment available to employees who are White, including, but not limited to,

subjecting him to disparate working conditions and compensation, and ultimately

terminating Plaintiff's employment.

40

177. As a direct and proximate result of Defendant K&L GATES's unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and will continue to suffer monetary and/or economic harm for which he is entitled to an award of damages.

178. As a direct and proximate cause of Defendant K&L GATES's discriminatory conduct, Plaintiff also suffered extreme mental anguish, depression, severe disruption of his personal and emotional life, and of enjoyment in the ordinary pleasures of everyday life.

179. As a result of Defendant K&L GATES's violation of the NYCHRL, Plaintiff has been damaged in an amount to be determined at trial but not less than Five Million Dollars ($5,000,000) for compensatory damages, emotional distress, adverse effects on his career, and diminished earning capacity.

180. Moreover, Defendant K&L GATES's unlawful and discriminatory actions were intentional, and done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff and his rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages in the amount of Five Million Dollars ($5,000,000) to punish and deter continuation of Defendant K&L GATES's unlawful employment practices.

181.   Plaintiff is further entitled to pre-judgment interest on all monies awarded, as well as reasonable attorneys' fees and costs.

### NINTH CAUSE OF ACTION
**(Retaliation in Violation of the NYCHRL)**
**(Against K&L Gates)**

182.   Plaintiff realleges and incorporates by reference the foregoing paragraphs.

183.   By the actions described above, among others, Defendant K&L GATES has retaliated against Plaintiff on the basis of his protected activities in violation of NYCHRL by, inter alia, ignoring his protected complaints about the discriminatory treatment of non-White employees, subjecting him to increased scrutiny and harassment and ultimately terminating his employment.

184.   As a direct and proximate result of Defendant K&L GATES's unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and will continue to suffer monetary and/or economic harm for which he is entitled to an award of damages.

185.   As a direct and proximate cause of Defendant K&L GATES's retaliatory conduct, Plaintiff also suffered extreme mental anguish, depression, severe disruption of his personal and emotional life, and of enjoyment in the ordinary pleasures of everyday life.

186.     As a result of Defendant K&L GATES's violation of the NYCHRL,

Plaintiff has been damaged in an amount to be determined at trial but not less than Five

Million Dollars ($5,000,000) for compensatory damages, emotional distress, adverse

effects on his career, and diminished earning capacity.

187.     Moreover, Defendant K&L GATES's unlawful and retaliatory actions

were intentional, and done with malice and/or showed a deliberate, willful, wanton, and

reckless indifference to Plaintiff and his rights under the NYCHRL for which Plaintiff is

entitled to an award of punitive damages in the amount of Five Million Dollars

($5,000,000) to punish and deter continuation of Defendant K&L GATES's unlawful

employment practices.

188.     Plaintiff is further entitled to pre-judgment interest on all monies awarded,

as well as reasonable attorneys' fees and costs.

## TENTH CAUSE OF ACTION
**(Aiding and Abetting Discrimination and Retaliation in Violation of the NYCHRL)**
**(Against the Individual Defendants)**

189.     Plaintiff realleges and incorporates by reference the foregoing paragraphs.

190.     By the actions described above, among others, the Individual Defendants

engaged in an unlawful discriminatory and retaliatory practice in violation of the

NYCHRL by aiding, abetting, inciting, compelling, and coercing the unlawful

discrimination in violation of the NYSHRL.

191.    As a direct and proximate result of the Individual Defendants' unlawful discriminatory and retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered and will continue to suffer monetary and/or economic harm for which he is entitled to an award of damages.

192.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff also suffered extreme mental anguish, depression, severe disruption of his personal and emotional life, and of enjoyment in the ordinary pleasures of everyday life.

193.    As a result of Defendants' violation of the NYCHRL, Plaintiff has been damaged in an amount to be determined at trial but not less than Five Million Dollars ($5,000,000) for compensatory damages, emotional distress, adverse effects on his career, and diminished earning capacity.

194.    Moreover, Defendants' unlawful actions were intentional, and done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff and his rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages in the amount of Five Million Dollars ($5,000,000) to punish and deter continuation of Defendants' unlawful employment practices.

195.    Plaintiff is further entitled to pre-judgment interest on all monies awarded, as well as reasonable attorneys' fees and costs.

## ELEVENTH CAUSE OF ACTION

**(Negligent Hiring, Training, Retention and Supervision)**
**(As Against K&L GATES)**

196.   Plaintiff realleges and incorporates by reference the foregoing paragraphs.

197.   As a result of Plaintiff's complaints, Defendant K&L GATES knew or should have known by the exercise of diligence and reasonable care of the racially based hostile work environment and discrimination perpetuated by Defendant K&L GATES's management employees.

198.   Defendant K&L GATES failed to properly select, train and supervise its managers such that incidents of discrimination, retaliation, harassment, hostile work environment are prevented and, if not prevented, properly investigated and corrected.

199.   As a direct and proximate result of Defendant K&L GATES's negligent conduct, Plaintiff has suffered and will continue to suffer monetary and/or economic harm for which he is entitled to an award of damages.

200.   As a direct and proximate cause of Defendant K&L GATES's negligent conduct, Plaintiff also suffered extreme mental anguish, depression, severe disruption of his personal and emotional life, and of enjoyment in the ordinary pleasures of everyday life.

201.   As a result of Defendants' negligent conduct, Plaintiff has been damaged in an amount to be determined at trial but not less than Five Million Dollars ($5,000,000)

for compensatory damages, emotional distress, adverse effects on his career, and

diminished earning capacity.

202.    As a result of the foregoing, Plaintiff has been damaged in an amount to

be determined at trial but not less than Five Million Dollars ($5,000,000) for

compensatory damages, emotional distress, adverse effects on his career, and diminished

earning capacity.

## TWELFTH CAUSE OF ACTION
### Unjust Enrichment) (As Against
### All Defendants)

203.    Plaintiff realleges and incorporates by reference the foregoing

paragraphs.

204.    Defendants have been substantially and materially enriched by

Plaintiff's efforts, contacts, associations, affiliations, and work.

205.    Defendants, to this date, continue to reap the benefits of Plaintiff's

efforts, contacts, associations, affiliations, and work.

206.    Plaintiff has contributed years of his own personal finances that

have helped to enrich Defendants.

207.    It is against equity and good conscience to permit Defendants to retain the

benefit of Plaintiff's efforts, contacts, associations, affiliations, and work without

properly and fully compensating Plaintiff therefor.

208.    As a result of the foregoing, Plaintiff has been damaged in an amount to

be determined at trial but not less than Five Million Dollars ($5,000,000).

### THIRTEENTH CAUSE OF ACTION (Intentional Infliction of Emotional Distress)

**(As Against All Defendants)**

209.    Plaintiff realleges and incorporates by reference the foregoing paragraphs.

210.    By the actions described above, among others, Defendants engaged in

extreme and outrageous conduct.

211.    Among others, Defendant Bicks engaged in extreme and outrageous

conduct.

212.    Defendants sending private investigators and on and off duty police

officers after Plaintiff and his family is extreme and outrageous conduct.

213.    This conduct by Defendants was intended to cause Plaintiff mental

anguish and severe emotional distress.

214.    As a direct and proximate cause of Defendants' conduct, Plaintiff suffered

extreme mental anguish including severe emotional distress, depression, severe

disruption of his personal and emotional life, and of enjoyment in the ordinary pleasures

of everyday life.

47

215.     As a result of Defendants' conduct, Plaintiff has been damaged in an

amount to be determined at trial but not less than Five Million Dollars ($5,000,000) for

compensatory damages, emotional distress, adverse effects on his career, and diminished

earning capacity.

216.     Plaintiff is further entitled to reasonable attorneys' fees and costs.

### FOURTEENTH CAUSE OF ACTION
#### (Negligent Infliction of Emotional
#### Distress) (As Against All Defendants)

217.     Plaintiff realleges and incorporates by reference the foregoing paragraphs.

218.     Defendants owed Plaintiff, as their employee, a duty of care.

219.     Defendants, by the actions described above, breached their duty to

Plaintiff.

220.     This conduct by Defendants was intended to cause Plaintiff mental

anguish and severe emotional distress.

221.     As a direct and proximate cause of Defendants' conduct, Plaintiff suffered

extreme mental anguish including severe emotional distress, depression, severe

disruption of his personal and emotional life, and of enjoyment in the ordinary pleasures

of everyday life.

222.     As a result of Defendants' conduct, Plaintiff has been damaged in an

amount to be determined at trial but not less than Five Million Dollars ($5,000,000) for

compensatory damages, emotional distress, adverse effects on his career, and diminished

earning capacity.

223.   Plaintiff is further entitled to reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

Wherefore, the Plaintiff prays that the Court grant the following relief:

a)   Enjoin Defendants from: (I) subjecting employees to discrimination and
harassment including a hostile work environment based on race; and (ii)
retaliating against employees who engage in activity protected under Section
1981, Title VII, the New York State Human Rights Law, and New York City
Human Rights Law;

b)   Enjoin Defendants from harassing Plaintiff including sending private investigators
and on and off duty police officers after Plaintiff and his family and to his home;

c)   Order Defendants to develop and implement appropriate and effective measures
designed to prevent discrimination, harassment, and retaliation, including but not
limited to policies and training for employees and managers;

d)   Order Defendants to develop appropriate and effective measures to receive
complaints of discrimination, harassment, and retaliation as well as a process for
investigating such complaints;

e)   Order Defendants to make whole Plaintiff by providing appropriate back pay with
pre-judgment interest, and other affirmative and equitable relief necessary to
eradicate the effects of their unlawful employment practices;

f)   Order Defendants to make Plaintiff whole by providing compensation for past and
future pecuniary losses resulting from the unlawful employment practices
described above, including but not limited to medical expenses in amounts to be
determined at trial but not less than Five Million Dollars ($5,000,000);

g)   Order Defendants to make whole Plaintiff by providing compensation for past and
future non-pecuniary losses, including emotional pain, suffering, inconvenience,
mental anguish, loss of enjoyment of life, and humiliation in amounts to be
determined at trial but not less than Five Million Dollars ($5,000,000);

h)  Order Defendants to pay Plaintiff punitive damages for their malicious reckless conduct described above, in amounts to be determined at trial but believed not to exceed Five Million Dollars ($5,000,000);

i)  Order Defendants to provide Plaintiff with (i) a copy of the Merger Agreement between Kilpatrick Lockhart and Preston Gates, including the country risk report prepared in connection with the merger, detailing Preston Gates' relationships with The Chinese Communist Party and (ii) the reports prepared by Defendants related to security wall breaches over the past 14 months in the Firm's Beijing, Shanghai, Seoul, Taipei, Hong Kong and Seattle offices;

j)  Award Plaintiff pre-judgment interest on each and every amount owed to Plaintiff;

k)  Award Plaintiff all attorneys' fees, expert fees, and other costs; and

l)  Award any and all other relief as is or may be awardable or recoverable under applicable law.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all claims triable by a jury.

Dated: March 22, 2021
        New York, New York

Yours truly

WILLIE E. DENNIS Plaintiff Pro Se
P.O. Box 872
New York, New York 10150

**By**:  Willie E. Dennis

50